# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

October 2, 2024

<u>By ECF and Email</u>
The Honorable William F. Kuntz, II
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. Juwan Anderson*, 22-CR-428 (WFK)

Dear Judge Kuntz:

We write in anticipation of sentencing, which is scheduled for October 30, 2024. Mr. Anderson's maturation since his arrest is evident. Over two years on pretrial release, Mr. Anderson has made significant strides in the right direction. He has engaged in programming, maintained strong family relationships, and led a law-abiding life. Through his actions, Mr. Anderson has demonstrated a commitment to rehabilitation.

Section 3553(a) of Title 18 requires the Court to balance interests in punishment, incapacitation, deterrence, and rehabilitation. As discussed in further detail below, the mitigating circumstances of Mr. Anderson's childhood, his lack of criminal history, his rehabilitation on pretrial release, and relative culpability in the offense warrant a non-incarceratory sentence. The defense respectfully requests that the Court sentence Mr. Anderson to probation, a sentence sufficient, but not greater than necessary, to achieve the statutory goals of sentencing. *See* 18 U.S.C. 3553(a).

*Mr. Anderson's guidelines range*

The Presentence Investigation Report ("PSR") accurately captures the offense conduct and the guidelines calculation as stipulated in the plea agreement. However, as discussed below, the guidelines calculation in the PSR overstates the appropriate sentencing recommendation.

*The government has not met its burden to show that the requested restitution amount accurately reflects the victims' actual loss.*

The government requests that the Court order $402,639 in restitution, the purported value of jewelry and personal items taken from the victims in this case. The government bases the loss amount solely on photographs of appraisal records. We do not know the provenance of those photographs, but we believe they were provided by Bishop Lamor Whitehead, a convicted fraudster with an established history of forging financial documents. *See* Ind. No. 22-cr-692 (LGS), ECF No. 232.

We object to the entry of restitution based on this proof alone. These photographs do not establish the stolen jewelry's value by preponderance of the evidence and the Court should decline to order restitution on that basis alone. In the alternative, a hearing is required to properly calculate the loss amount.

Under the Mandatory Victims Restitution Act ("MVRA"), restitution is mandatory for certain crimes where an identifiable victim has suffered a pecuniary loss. *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). Restitution is authorized only "for losses that [were] . . . directly caused by the conduct composing the offense of conviction," *United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994), and is limited to the victim's "actual loss." *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998). Restitution may be challenged "on the ground that it does not reflect the losses to the victims." *United States v. Harris*, 302 F.3d 72, 75 (2d Cir. 2002), citing 18 U.S.C. § 3664(f)(1)(A). The government bears the burden of establishing the victim's actual loss by a preponderance of the evidence. *See* 18 U.S.C. § 3664(e); *United States v. Gushlak*, 728 F.3d. 184, 195 (2d Cir. 2013).

Here, the government has failed to meet its burden. It bases the losses sustained by the victims on photographs of documents that are purportedly appraisal records. *See* Ex. A (photographs of alleged appraisal documents provided in discovery, bates stamp US_000001-US_000006). These photographs are not self-authenticating, and nothing in the PSR or the discovery turned over by the government establishes their chain of custody or otherwise attests to their authenticity. As such, the photographs do not establish the proof necessary to meet the government's burden. This is especially true in light of their likely source, Mr. Whitehead, who has burnished an infamous reputation for acts of dishonesty and forgery for financial gain.

Indeed, Mr. Whitehead was recently convicted of wire fraud, attempted wire fraud, and attempted extortion and sentenced to nine years in prison. *See Whitehead*, No. 22-cr-692 (LGS), ECF No. 232 (judgement of conviction). According to the government, "Lamor Whitehead . . . is a career conman and liar who has been committing frauds for over 20 years to finance his extravagant lifestyle." *United States v. Whitehead*, No. 22-cr-692 (LGS), ECF No. 223 at 1. Over the course of years, he defrauded numerous financial institutions by filing fraudulent loan applications backed by "doctored Wells Fargo bank statements" and phony IRS forms that falsely inflated his assets and income. *Id*. at 3-4. This scheme netted him millions of dollars in fraudulently obtained loans. *Id*. Not only did he steal from financial institutions, through lies and deceit he defrauded a member of his church congregation out of $90,000 from her retirement account. *See id*. at 4-6. And through the use of violent threats, he attempted to extort his mechanic out of $5000. *See id*. at 6-7.

Given the victim's established practice of forging financial documents, the Court should decline to order restitution entirely. 18 U.S.C. 3663(a)(1)(ii) provides:

> To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order.

This provision reflects Congress's intent that "sentencing courts not become embroiled in intricate issues of proof," and that the "process of determining an appropriate order of restitution be streamlined." *United States v. Reifler*, 446 F.3d 65, 136 (2d Cir. 2006). Here, the Court's interest in calculating a loss amount in order to reimburse Mr. Whitehead on the basis of records of unknown origin and dubious authenticity should not outweigh the Court's interest in streamlining the sentencing proceedings.

Therefore, restitution should not be ordered. In the alternative, we respectfully request that a hearing be held pursuant to 18 U.S.C. § 3664(d)(5) within 90 days of sentencing.

*Just punishment does not require a guidelines sentence.*

Just punishment can be achieved in this case with a below-guidelines sentence, despite the seriousness of the offense. This is based Mr. Anderson's relative culpability in the crime and sentencing practice for similarly situated defendants in this district.

Among the three participants in the crime, Mr. Anderson had the least culpable role. Unlike his two codefendants, he did not possess or brandish a firearm. Nor did he physically threaten Bishop Whitehead or his wife or use physical force when taking their jewelry. His role, rather, was to collect the jewelry after it had been removed and drive away with his codefendant, Say-Quan Pollack. Although Mr. Anderson is responsible for the actions of his codefendants, *see* PSR ¶ 11, the Court should weigh his particular role in the crime when assessing his relative culpability and the appropriate sentence for it. His relative culpability merits a lesser punishment.

United States Sentencing Commission data reveal that people with Mr. Anderson's criminal history who have recently been sentenced in this district for armed robbery do not receive a sentence within Mr. Anderson's guidelines. Rather, the median similarly situated defendant has received less than two years' imprisonment. These recent sentencing outcomes indicate that less than 51 months' incarceration is enough to afford just punishment and adequately reflect the seriousness of the crime.

Sentencing Commission data show that in the last two fiscal years, there were 28 people sentenced to prison in this district for Hobbs Act robbery who fell within criminal history category I. For this cohort of defendants, the median sentence was 23 months and the average sentence was 37 months. Half of this group received sentences of less than two years, as reflected in the following graph produced using the Sentencing Commission's Interactive Data Analyzer ("IDA").[1]

---

[1] The IDA can be accessed at: https://ida.ussc.gov/analytics/saw.dll?Dashboard. We obtained this chart by using the IDA's Sentencing Outcomes field and inputting the following variables: fiscal years 2022 and 2023; geographical region of Eastern District of New York; primary guideline § 2B3.1; and criminal history category I.



Recent sentencing practice in this district thus shows that a sentence of less than 51 months' imprisonment is sufficient to afford just punishment and adequately reflect the seriousness of Mr. Anderson's participation in this robbery. A below-guidelines sentence, in other words, can satisfy the first § 3533(a)(2) factor for this least culpable participant in this crime.

*A below-guidelines sentence is sufficient to deter Mr. Anderson.*

This is Mr. Anderson's first conviction. PSR ¶¶ 30-31. He therefore has no criminal history category points. *Id.* ¶ 32. And he only has one other arrest for a misdemeanor arising from an argument with his girlfriend that was promptly dismissed. *See* PSR ¶ 36.

The absence of prior convictions indicates that Mr. Anderson is statistically unlikely to reoffend. As the Sentencing Commission has observed, approximately three-quarters of all federal defendants like Mr. Anderson with zero criminal history points do not recidivate. U.S. Sentencing Comm'n, *Recidivism of Federal Offenders Released in 2010* at 26 (Sept. 2021), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf (last visited Sept. 26, 2024). That is by far the lowest rate among people sentenced in federal court. Indeed, even people with one criminal history category point are significantly more likely to reoffend than someone with Mr. Anderson's record. *See id.* (showing that recidivism rate for one-point criminal history offenders is 42.3%, as compared to 26.8% for zero-point offenders). The absence of prior convictions in Mr. Anderson's past strongly indicates that he does not pose a significant recidivism risk in the future. He does not need imprisonment to be deterred or incapacitated.

Mr. Anderson's recidivism risk is also tempered by his relative youth. He is 26 years old today but was 23 at the time of the crime. Although he was old enough to be held legally responsible as an adult, he was still developing neurologically in ways that matter to assessing his culpability and the likelihood that he will reoffend in the future.

As the Supreme Court noted nearly 20 years ago, "[i]mmaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human

brain conclude that human brain development may not become complete until the age of twenty-five." *Gall v. United States*, 552 U.S. 38, 58 (2007) (internal quotation marks omitted). Those studies are uniform that "[t]he frontal lobes, homes to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." Johnson, et al., *Adolescent Maturity and the Brain*, J. Adolescent Health 2009, *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/ (last visited Aug. 25, 2024). Further, criminological data—the so-called "age-crime curve"—demonstrate that once a person reaches his mid-20s, like Mr. Anderson has, his likelihood of reoffending drops significantly. *See United States v. C.R.*, 792 F. Supp. 2d 343, 505 (E.D.N.Y. 2011), *overruled on other grounds*, 731 F.3d 204 (2d Cir. 2013) ("[The] Age Crime Curve, which shows that misbehavior of almost every sort increases from age 10 or so on and peaks around 17 or 18 and then declines. And it's likely to be the case that that decline is related to improvements in self-regulation and in the maturation of self-control."); Roberto Flores de Apodaca et al., *Differentiation of the Age-Crime Curve Trajectory by Types of Crime*, Am. Res. J. of Hum. & Soc. Sci., vol. 1, issue 4, at 7 (2015), https://www.arjonline.org/papers/arjhss/v1-i4/1.pdf (last visited Sept. 26, 2024) (finding, based on study of California crime data, that "both property and violent arrest data start out low in the under-20 category, rise and peak in the mid 20's, and decline thereafter; conforming to classic descriptions of the Age-Crime Curve").

These scientific and sociological findings have recently prompted a response from the Sentencing Commission. As of November 1, 2024, the guidelines will contain the following language in section 5H permitting a sentencing judge to downwardly depart based on a defendant's age at the time of his crime.

A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* 25-26 (Apr. 30, 2024), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf (last visited Sept. 19, 2024).

This amendment accords with a proposal from the National Institute of Justice ("NIJ"), the research arm of the United States Department of Justice, that sentencing courts should consider applying an "immaturity discount" for defendants within Mr. Anderson's age range because "young adults ages 18-24 are more similar to juveniles with respect to their offending, maturation and life circumstances." NIJ, *From Juvenile Delinquency to Young Adult Offending* (2014), *available at* https://nij.ojp.gov/topics/articles/juvenile-delinquency-young-adult-offending (last visited Sept. 19, 2024). This reduction "would involve a decrease in the severity of penalties, taking into account a young person's lower maturity and culpability." *Id.* It also

recognizes that, as the Supreme Court observed about minors, offenders of Mr. Anderson's age "are more capable of change than are [older] adults, and their actions are less likely to be evidence of irretrievably depraved character than are the actions of adults" who have fully matured. *Graham v. Florida*, 560 U.S. 48, 68 (2010) (internal quotation marks omitted).

As these sources provide, Mr. Anderson's relative youthfulness at the time of the crime mitigates his culpability, reduces the likelihood that he will reoffend, and suggests that his conduct here "reflect[s] unfortunate yet transient immaturity." *Id.* at 73 (cleaned up). It, in combination with the absence of prior convictions, supports the conclusion that a sentence below the guidelines can more than adequately deter him from reoffending and constitute just punishment.

*Mr. Anderson experienced trauma and loss in his childhood.*

He routinely witnessed violence in his community and experienced enormous loss throughout his childhood and young adult life. See *id.* at 5. These experiences have had a lasting impact on Mr. Anderson and directly contributed to his actions in his case. See *id.* at 4.

Mr. Anderson was raised in Brooklyn, New York by his mother, Kisha Johnson. When Mr. Anderson was only six years old, his father, Osafa Anderson, was arrested and deported to his home country of Guyana. See PSR ¶ 38. The loss of his father was the first in a series of considerable losses in Mr. Anderson's life. Though Mr. Anderson enjoys a supportive and loving relationship with his mother and extended family, Ms. Johnson struggled to raise him on her own; their neighborhood was plagued by violence, drugs, and poverty. Ms. Johnson did the best she could to protect Mr. Anderson, but she could not shield him from the danger in his community. On a regular basis, Mr. Anderson witnessed fights and even shootings which normalized the violence that surrounded him. See Ex. B at 2.

During Mr. Anderson's childhood several close relatives passed away. When Mr. Anderson was 15, his maternal uncle, Jeffrey Johnson, was murdered in prison. The pain of this loss was particularly profound because Mr. Johnson had assumed a significant caretaking role when Mr. Anderson's father was deported. See PSR ¶ 40; Ex. B at 4. In 2017, Mr. Anderson lost another uncle who died from drug and alcohol abuse. See PSR ¶ 40. Mr. Anderson was the last person with his uncle before he died, and he blames himself for failing to realize that he was having a medical emergency before he passed away. See Ex. B at 4. In addition to losing two father figures, Mr. Anderson also suffered the loss of his maternal grandmother who died from substance abuse, and his aunt who was murdered in connection with her drug addiction. See *id.* at 2, 3.

Around the time of Mr. Johnson's death, Mr. Anderson's family and educators noticed changes in his personality: he began skipping school and misbehaving in class. See Ex. B at 3; *see also* Ex. D (Letter of Kisha Johnson). This change in behavior can be attributed to the trauma caused by the loss of his loved ones.

It is unsurprising that the lasting mental and emotional trauma caused by Mr. Anderson's childhood experiences led him to engage in criminal conduct. Without a father figure or other male role models in his life, Mr. Anderson looked for guidance in the wrong places and found mentorship from the wrong people. Those included his now-deceased codefendant Shamar Legette, an older friend of his mother's whom Ms. Johnson describes as "a person who is like a family member to them." PSR ¶ 45.

*Mr. Anderson's success on Pretrial release weighs in favor of a non-incarceratory sentence.*

Mr. Anderson's performance on pretrial release shows that he is capable of rehabilitation and will not engage in future criminal conduct. His success on pretrial release is noted in the PSR and evidenced by the gradual lessening of his release conditions. *See* PSR ¶ 6. On September 28, 2022, Mr. Anderson was released on home incarceration. *See* ECF No. 9. This condition was lifted on May 15, 2023, and Mr. Anderson was placed on home detention. *See* Dkt. Order, dated May 15, 2023. On March 28, 2024, home detention was downgraded, and Mr. Anderson was given a curfew with location monitoring. *See* Dkt. Order, dated March 28, 2024.

In addition, while on pretrial release Mr. Anderson engaged in programming aimed at improving his life. He enrolled in G.E.D. courses and took the G.E.D. exam on more than three occasions. Though Mr. Anderson has not yet passed the exam—he has consistently come up one or two points short on the math subtest—he remains committed to obtaining his G.E.D. and plans on taking the test again in the future.

He also successfully completed Focus Forward, a program dedicated to providing reentry support and educational courses for individuals charged with federal crimes. Not only did Mr. Anderson complete the program, he immersed himself in the curriculum and excelled. The facilitators of the program describe Mr. Anderson's excellent performance:

> Juwan Anderson embraced our class from the start. He took every opportunity to make the most out of meetings and homework assignments. His listening skills, thoughtful comments, and candor about past life experiences added value to the class discussions and prompted productive dialogue among the class members. When others in the class were still reluctant to participate, Juwan volunteered to lead the discussions and took the initiative before class to prepare questions and comments about the relevant topic. His thoughtful, respectful, and supportive contributions to class discussion were appreciated by his classmates, who nominated him to speak at graduation.

Ex. C (Letter of Focus Forward).

Mr. Anderson's achievements on pretrial release demonstrate a new sense of maturity and growth, and a sincere desire to move forward with his life in a positive direction. He is deeply remorseful for the crimes he committed and is fully aware that his actions in this case cannot be repeated. As Mr. Anderson's mother writes, "Juwan has expressed in many conversations that he has learned a valuable lesson with this situation and stated that once it's all over he will turn this lesson into something very positive." Ex. D (Letter of Kisha Johnson).

*A non-incarceratory sentence is sufficient to meet the goals of sentencing.*

Given the full scope of Mr. Anderson's history and characteristics, the 3553(a) factors point away from the need to incarcerate Mr. Anderson in order to meet the goals of sentencing. Mr. Anderson has proven through his actions on pretrial release that he does not need to be deterred or incapacitated by incarceration. Since he was arrested for the instant matter two years ago, he has shown rehabilitation by engaging in programing and demonstrating a commitment to his family. Moreover, Mr. Anderson spent nearly two years on the most restrictive forms of pretrial release supervision – home incarceration and home detention. This experience, along with continued court supervision, is sufficient to deter Mr. Anderson from future criminal conduct.

And so, the only remaining sentencing factor is punishment. As discussed above, the typical defendant in this district facing Mr. Anderson's charge with his criminal history category is sentenced to less than two years' imprisonment. Here, no imprisonment is necessary. As courts have said repeatedly, "[i]mprisonment is not the only way we punish." *United States v. Zimmerman*, 2012 WL 3779387 (E.D.N.Y. 2012) (citing *Gall v. United States*, 552 U.S. at 48–49 (2007)). This Court is empowered to sentence Mr. Anderson to an intensive period of probation. Should he violate, the Court would then have the full range of sentencing options— here, up to twenty years in prison—available as a sentence upon revocation of probation. Or the Court could sentence Mr. Anderson to supervised release, with any number of special conditions or reporting requirements. To incarcerate Mr. Anderson now, despite the rehabilitation he has shown, is to weigh pure punishment over every other factor.

As such, a non-incarceratory sentence of probation is sufficient to accomplish the goals of sentencing.

*Conclusion*

Juwan Anderson has shown over the last two years that he does not pose a risk of recidivism. And a below-guidelines sentence is sufficient to afford just punishment. We ask the Court to impose such a punishment and sentence Mr. Anderson to a period of probation.

Respectfully submitted,

/s/ _____
Benjamin Yaster
Kyla Wells
Federal Defenders of New York, Inc.
*Counsel for Juwan Anderson*

cc:    AUSA Rebecca Schuman (by ECF)
       USPO Cheyanne Ralph (by email)

# EXHIBIT A



**Date: 4/7/2022**

37 West 47th St. #211
New York, NY 10036
1-212-729-8039

Appraisal Number – 22RF110704

**Description of Article: Custom Diamond Cross Pendant**

Carat:          8.50 TCW Approx.
Shape & Cut:    Princess & Round Cut
Color:          H & Blue*
Clarity:        SI

## Additional Info.

Metal Purity:   14K Yellow Gold
Total Weight:   64.1 Grams



**Comments:** Graded As Mounting Permits
*Treated Color

The estimated appraisal by the American Appraisal
Association is the replacement value at which the
product could be acquired and purchased in a retail
store. All jewelry pieces are determined by
gemological guidelines. The client should not predict
to market the product for the appraised amount.

**$7,995**

Estimated Retail Replacement Value
For Insurance Purposes Only

This report is based on
generally accepted grading
techniques. Characteristics
are determined using master
comparison stones, 10x
loupe or binocular
microscope, a millimeter
gauge, UV lamp, and carat
scale.

COPYRIGHT © 2022
TERMS AND CONDITIONS ON REVERSE
This Document Contains Security Features to Prevent Unauthorized Duplicates

GIA Gemologist

**Date:** 4/

# AMERICAN APPRAISAL ASSOCIATION

37 West 47th St. #211
New York, NY 10036
1-212-729-8039

## Appraisal Number – 22RF110704

## Description of Article: Custom Diamond Cross Pendant

| | |
|---|---|
| Carat: | 8.50 TCW Approx. |
| Shape & Cut: | Princess & Round Cut |
| Color: | H & Blue* |
| Clarity: | SI |

### dditional Info.

etal Purity:   14K Yellow Gold
ol Weight:   64.1 Grams





## $7,995

**Estimated Retail Replacement Value**
**For Insurance Purposes Only**

omments: Graded As Mounting Permits
*Treated Color

he estimated appraisal by the American Appraisal
ssociation is the replacement value at which the
oduct could be acquired and purchased in a retail
are. All jewelry pieces are determined by
mological guidelines. The client should not predict
market the product for the appraised amount.

This report is based on
generally accepted grading
techniques. Characteristics
are determined using master
comparison stones, 10x
loupe or binocular
microscope, a millimeter
gauge, UV lamp, and carat
scale.

OPYRIGHT © 2022
RMS AND CONDITIONS ON REVERSE
This Document Contains Security Features to Prevent Unauthorized Duplicates

GIA Gemologist

US_000002



**Date: 4/7/2022**

37 West 47th St. #211
New York, NY 10036
1-212-729-8039

Appraisal Number – 22RF120704

## Description of Article: Custom Diamond Cross Pendant & Diamond Cuban Chain

Carat:         38.50 TCW Approx.
Shape & Cut:   Round Cut
Color:         G-H
Clarity:       VS-SI

### Additional Info.

Metal Purity:   14K Yellow Gold
Total Weight:   382.4 Grams
Length:         22 Inches





**$56,795**

Estimated Retail Replacement Value
For Insurance Purposes Only

Comments: Graded As Mounting Permits

The estimated appraisal by the American Appraisal
Association is the replacement value at which the
product could be acquired and purchased in a retail
store. All jewelry pieces are determined by
gemological guidelines. The client should not predict
to market the product for the appraised amount.

This report is based on
generally accepted grading
techniques. Characteristics
are determined using master
comparison stones, 10x
loupe or binocular
microscope, a millimeter
gauge, UV lamp, and carat
scale.

COPYRIGHT © 2022
TERMS AND CONDITIONS ON REVERSE

US_000003



# AMERICAN APPRAISAL ASSOCIATION

Date: 10/20/2021
Lamor Whitehead

t St. 11
Y NY 10
212-729-8059

Appraisal Number – 21JP102010

## Description of Article: Custom Diamond Miami Cuban Chain

| | |
|---|---|
| Carat: | 40.00 TCW Approx. |
| Shape & Cut: | Round Cut |
| Color: | F-G |
| Clarity: | VS |

## Additional Info.

Metal Purity: 14K Yellow Gold
Total Weight: 350.2 Grams





## $51,175

Estimated Retail Replacement Value
For Insurance Purposes Only

Comments: Graded As Mounting Permits

The estimated appraisal by the American Appraisal Association is the replacement value at which the product could be acquired and purchased in a retail store. All jewelry pieces are determined by gemological guidelines. The client should not predict to market the product for the appraised amount.

This report is based on generally accepted grading techniques. Characteristics are determined using master comparison stones, 10x loupe or binocular microscope, a millimeter gauge, UV lamp, and carat scale.

COPYRIGHT © 2021
TERMS AND CONDITIONS ON REVERSE
This Document Contains Security Features to Prevent Unauthorized Duplicates

GIA Gemologist

US_000004

Date: 4/7/2022



**AMERICAN
APPRAISAL
ASSOCIATION**

37 West 47th St. #211
New York, NY 10036
1-212-729-8039

**Appraisal Number** – 22RF100704

**Description of Article:** Rolex DateJust Custom Diamond Watch

| | |
|---|---|
| Model Number: | 16233 |
| Serial Number: | P419892 |
| Movement: | Automatic |
| Bezel: | Diamond Bezel |
| Dial: | Diamond Dial |
| Bracelet: | Stainless Steel and 18K Yellow Gold with Diamonds |
| Case Size: | 36 mm |

**Diamonds:**

| | |
|---|---|
| Carat: | 10.00 CT. Approx. |
| Cut: | Round Brilliant Cut |
| Color: | G-H |
| Clarity: | VS-SI |



## $21,500

**Estimated Retail Replacement Value
For Insurance Purposes Only**

**Comments:** Graded As Mounting Permits

The estimated appraisal by the American Appraisal Association is the replacement value at which the product could be acquired and purchased in a retail store. All jewelry pieces are determined by gemological guidelines. The client should not predict to market the product for the appraised amount.

This report is based on generally accepted grading techniques. Characteristics are determined using master comparison stones, 10x loupe or binocular microscope, a millimeter gauge, UV lamp, and carat scale.

COPYRIGHT © 2022
TERMS AND CONDITIONS ON REVERSE

🔒 This Document Contains Security Features to Prevent Unauthorized Duplicates

GIA Complete

US_000005

**AMERICAN GEM SOCIETY LABORATORIES**

*Setting the Highest Standard for Diamond Grading*

# AMERICAN GEM SOCIETY LABORATORIES®
## *Diamond Quality® Report*

**AGS 104116748010**

December 03, 2021

| | |
|---|---|
| Shape and Style | Square Modified Brilliant |
| Measurements | 9.27 x 9.08 x 6.62 mm |
| Cut Grade | AGS Excellent 1 |
| Color Grade | AGS 3.0 (J) |
| Clarity Grade | AGS 8 (I1) |
| Carat Weight | 5.010 cts. |
| Finish | |
| Polish | Excellent |
| Symmetry | Very Good |
| Proportions | |
| Total Depth | 72.9% |
| Table | 72.0% |
| Girdle | Medium to Thick |
| Culet | Pointed |



100%
72.0%
51.4°
9.9%
3.5% to 5.4%
39.2°
58.2%
72.9%
Pointed

**Comments**

Fluorescence: Negligible
Girdle inscribed "116218"
Additional remaining wisps and surface graining not shown

**Key to Symbols**

Twinning Wisp
Crystal
Feather
Indented Natural
Cavity



**PLOT INFORMATION:** The Clarity grade is diagrammed using the clarity symbols contained in the *AGS Diamond Standards Manual*. Red marks indicate inclusions, green marks indicate external blemishes.

| Cut Scale | AGS | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | AGS Ideal | AGS Excellent | AGS Very Good | | AGS Good | | AGS Fair | | | AGS Poor | |

| Color Scale | AGS | 0 | 0.5 | 1.0 | 1.5 | 2.0 | 2.5 | 3.0 | 3.5 | 4.0 | 4.5 | 5.0 | 5.5 | 6.0 | 6.5 | 7.0 | 7.5 | 8.0 | 8.5 | 9.0 | 9.5 | 10.0 | 10 | Fancy Yellow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GIA | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z | Fancy Yellow |
| | | COLORLESS | | | NEAR COLORLESS | | | | FAINT | | VERY LIGHT | | | | | LIGHT | | | | | | |

| Clarity Scale | AGS | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GIA | Flawless/IF | VVS1 | VVS2 | VS1 | VS2 | SI1 | SI2 | I1 | I2 | I3 | |

**THIS REPORT IS NOT A WARRANTY, GUARANTEE OR APPRAISAL OF VALUE.**

**IMPORTANT NOTICE:** All three quality factors of Cut, Color, and Clarity can dramatically affect the beauty and value of a diamond. Because of cutting, diamonds with the same color and clarity grades can vary in value by as much as 50% or more. Therefore, it is advisable to consult a Certified Gemologist® or other credentialed gemologist, before purchasing this Diamond. **ORIGINAL**

Copyright © 1996-2015 American Gem Society Laboratories, LLC
All Rights Reserved

**NOTICE: Important limitations on reverse**

US_000006

# EXHIBIT B



**JUWAN ANDERSON**
**Cr. #: 22-CR-425**

**July 18, 2024**

Ms. Kyla Wells, Esq.
Federal Defenders of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

Dear Ms. Wells,



6. 









EXHIBIT C

**THE FOCUS FORWARD PROJECT, INC.**

P.O. Box 2892, Church St. Station, New York, NY 10008-2892 | Tel: (347) 619-2080 | info@focusforwardproject.org

Pamela Miller
*Executive Director*

**BOARD OF DIRECTORS**

Anne Patterson Finn
*Chairperson*

Justine Kentla

Alexandra Katz

Deirdre von Dornum

Amy Finzi

Kathleen Veteri

Alexandra Conlon

**August 22, 2023**

The Honorable William F. Kuntz
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 10007

Dear Judge Kuntz,

We write to you in our capacity as Co-Facilitators of The Focus Forward Project, in support of Juwan Anderson, a recent graduate of the program. The Focus Forward Project is a nonprofit organization dedicated to providing an educational curriculum focused on reentry for individuals charged with federal crimes. Our classes are offered for people who are incarcerated and for those under pretrial supervision.

The goal of The Focus Forward Project is to provide participants with the confidence and practical tools to move forward successfully with their lives. The 12-week course is designed to provide both an intellectual and emotional outlet for participants as they navigate the stress and uncertainty of the pretrial phase of their federal cases. The class meets once a week for just over two hours, and participants complete weekly reading, journal, and other homework assignments. The first half of each class is spent discussing and connecting with themes in the memoir, *A Long Way Gone*, by Ishmael Beah, who was a boy soldier in the Sierra Leone civil war, while the second half of each class focuses on life skills, highlighting a different skill each week. By the end of the course, participants will have gained a variety of transferable skills and tools, including, but not limited to: a completed resume, interview skills, conflict resolution skills, public speaking skills, and the setting of both short and long-term goals. Focus Forward is celebrating its 11th year of impacting hundreds of lives in positive and uplifting ways.

Juwan Anderson embraced our class from the start. He took every opportunity to make the most out of meetings and homework assignments. His listening skills, thoughtful comments, and candor about past life experiences added value to the class discussions and prompted

productive dialogue among the class members. When others in the class were still reluctant to participate, Juwan volunteered to lead the discussions and took the initiative before class to prepare questions and comments about the relevant topic. His thoughtful, respectful, and supportive contributions to class discussion were appreciated by his classmates, who nominated him to speak at graduation.

The themes of resilience and maintaining hope in *A Long Way Gone* resonated with Juwan who often shared insightful comments about the book.  He was particularly interested in the author's struggle to move beyond the adversities he faced as a boy soldier.  Juwan was quick to identify how unfairly the author and his friends were treated before they became boy soldiers, often shunned, and mistreated by townspeople. While he understood that the townspeople's behavior was rooted in fear and for that reason understandable, Juwan pointed out that it was not correct and added to a cycle of violence and alienation. Juwan explained that we "should not judge a book by its cover." He also observed that while the boy soldiers in the book were too young to think for themselves and were manipulated by the army into killing and taking drugs, mature adults should think for themselves and not succumb to social or group pressure. Juwan found Ishmael Beah's journey from a boy soldier in Sierra Leone to "an author and a good person," to be inspiring: "[Beah] found his true self and came out a good person."

Juwan was very focused on the life skills presented in each class and often took immediate steps to incorporate them into his life. For example, after the session devoted to setting goals, he was inspired to research GED classes in his neighborhood. By the end of the course, he was enrolled in a GED class which met each weekday from 9:00 am to 2:00 pm.  He is currently scheduled to take an exam this month, which we are sure, given his focus and work ethic, that he will have diligently prepared for. Similarly, following the class session on resume writing, Juwan was the first member of the class to send us a draft of his resume and schedule a meeting to review it.  Another notable example of Juwan's executive ability was his asking each of his classmates to identify a passage in the reading assignment for the following week which they found interesting. He explained that by doing this he thought his classmates would become more involved in the class discussion. No doubt, Juwan's ability to self-start and organize tasks will assist him in the future.  As he explained, "Goals keep me positive and on task."

Juwan was clear about how much he appreciates his family's support, especially his mother who "has sacrificed" for him and "supported [him] throughout [his] life."  As he said, his family's support helps to "keep [him] hopeful." He credits his parents for enrolling him as a teenager in Job Corps, which he described as a life changing program that he very much needed at that time. After an initial adjustment period there, he matured and gained discipline. He still appreciates how the program taught him the importance of a routine, hard work, taking responsibility, and learning. As facilitators, we witnessed how well Juwan has internalized these skills.

 Juwan's long-term goals were also admirable and realistic. He is focused on a career, perhaps as a contractor with expertise in construction, where he could make a good living and provide for his family. Unlike certain classmates, Juwan does not place a premium on becoming wealthy to buy material things, instead he values making money to provide for the basic needs of his family. He asserted that "there are certain important things that money can't buy." He wishes to remain mentally stable and fit, to have a circle of genuine, down to earth, and hardworking friends, and to have the free time to pursue his interest in rebuilding cars. Juwan's hope for the future is to "look back and know I made the right choices for myself and my family." We are confident that his skills and determination will enable Juwan Anderson to acquire the tools necessary to make those choices that will ensure his future is productive and rewarding.

Your Honor, our intent is to provide you with our experience with Juwan Anderson. We appreciate the time you have taken to read our letter, and if you have any questions, please feel free to contact our supervisors at the Focus Forward Project by phone or email: (347) 619-2080 or info@focusforwardproject.org.

Sincerely,

Anne Patterson Finn (Aug 24, 2023 20:27 EDT)

**Anne Patterson Finn**
Focus Forward Project
Class Facilitator

Jacob Kosowsky (Aug 23, 2023 20:40 EDT)

**Jacob Kosowsky**
Focus Forward Project
Class Facilitator

# EXHIBIT D

September 18, 2024

Hon. William F. Kuntz, II
United States District Judge
Eastern District of New York

Dear Your Honor:

My name is Ms. Kisha Johnson. I work under the umbrella of DHS/Department of homeless services. I am a housing specialist. I assist families who become homeless for whatever reasons with getting back on track with permanent housing and job placements.

I am the mother of Mr. Juwan Anderson and have known Juwan for 26 years of his life. In December 1997, I was 20 going on 21 years of age when I because pregnant with Juwan. I was confused and not sure of what I was getting myself into on top of the fact that me and Juwan dad Mr. Osafa Anderson was not together that long. But everyone on both sides of Juwan's family was happy and gave support from the time I carried Juwan until now. 26 years later the support still remains strong as ever from family and loving friends.

Juwan was a very happy baby/child. He had everything a kid could ask for, want and need. Juwan loved to go to the store when he was a child and he would always buy something for the bigger kids in the house. Since he was a kid Juwan was kind loving and very giving. Still until today he still have the same manners and good heart.

Juwan grew up around both sides of his family. My side of the family which is a very large family so Mr. Anderson had many male role models in the house who always guided him in the right direction as a boy into his teenage years as well as adult years too.

When Juwan was 15, he lost his uncle, my brother Jeffrey Johnson. He was very close to Jeffrey. Jeffrey came across some trouble and had to go to prison. However, he did not make it home from prison when he was scheduled to in March of 2013 because he was murdered in jail by someone who suffered from mental health issues which had a big impact on Juwan's life in such a horrible way. My son looked up to my brother and loved him very much because of the love and care my brother gave him. Juwan started to act out just a little bit in Junior High School because he was hurting and sad but deep down inside he knew it was not like him to act out in school or misbehave or follow others. So it did not take him long to get back on the right track because he knew his uncle would not approve of that and it would not make me happy.

I sent Juwan to Job Corp so that he can finish his education because I did not want him to mess up in school or his education. Juwan understood and agreed with my decision and signed up for the program. He went on to start the program and manage to complete the program with his G.E.D. and a certificate in building and maintenance.

In July 2022 Juwan made some choices that would change his life as well as everyone around him especially his mother. However, he did own up to his role played in the situation. I can honestly say that the decision was most certainly regretful on the behalf of Juwan. He has

expressed to me that he has always since the day it happened he got on his knees and prayed and asked god for his forgiveness for his actions and role he played on that day.

On behalf of Juwan, myself and my entire family, we would like to apologize to the courts, the church and any families that may have been affected by this situation, and most of all the pastor his wife and daughter who was present on that day. Juwan has expressed in many conversations that he has learned a valuable lesson with this situation and stated that once it's all over he will turn this lesson into something very positive.

Juwan has expressed the changes he will make once the situation is over with. He talked about getting a clothing line creating his own style of jeans because he is very much so into fashion. He also expressed he would like to mentor young youth guiding them into the right direction and not to go into this direction or make any bad choices that will lead them to prison jail or death.

I will be working on myself as well. If Juwan should do any time all my time will be spent researching, joining organizations and seminars to prepare for when Juwan will be released from prison so that I can give him that push start to getting back on track and confront his goals. I will do my best to support my son because I do not want him to ever think his situation will hold him back. I want him to know its okay and he can pick up the pieces and start all over again because god is a god of second chances.

I ask Your Honor to please have some mercy on my soul when sentencing Juwan. He is my only child, my only son whom I lived with all his life. I know what it is to live with my son but I can honestly say I don't know where to begin with living without my son. He is a good son outside of this situation. I will miss my son and will have sleepless nights due to the fact I lost my brother in prison in 2013 3 months before his release date. Again, I ask the courts to have mercy on my soul. Again, I do genuinely apologize for any hurt pain inconvenience and disrespect this situation may have caused.

Thank you for taking the time out to read my letter.


Ms. Kisha Johnson

*K. Johnson*

# EXHIBIT E

July 29, 2024


Hon. William F. Kuntz, II

United States District Judge

Eastern District of York


Dear Your Honor,

      I am Nikia Johnson, and my job title is a Direct Support Professional. I am Mr. Anderson's oldest aunt and for 25 years I've been a part of his life. Mr. Anderson was one of the kids that always loved his family and it's a lot of us. He always had options to learn from family he was around. He grew up with two cousins and an uncle his age, so he always had someone to play with. Juwan also liked to stay at his grandmother's house (Father's Mother) with his other cousins as well.

I stayed with Juwan and his mother for a while. He has always been loving, respectful, caring and well mannered. I've always taught him to be respectful, kind, stay in a child's place and have empathy for others because it will follow you a long way in life. Mr. Anderson has become a wonderful young man that goes out to feed the homeless people and gave away clothes that he couldn't fit any more.

Since Mr. Anderson's arrest, our family has been shocked and disappointed. We all are just trying to stay positive and in a right state of mind for him because we are all hurt. Our family is truly concerned because we lost a loved one that was incarcerated before, which truly impacted our family and worried our grandmother because she always told us all that trouble is easy to get into. Juwan is not a confrontational kid. With Juwan being on house arrest it has truly shown him that life isn't easy, and he is suffering everyday behind this situation sir.


The way I am with all the kids at home I am called the mean auntie because I stay on them a lot about their life's including the things they do and the people they associate their time with. Juwan's mother does not play with him as well, so I know this was not the trouble he was looking to get into sir. His mother has raised well as a single mother and will continue doing a great job with him.

I believe Juwan has every intention on improving in life as Mr. Anderson is in the process of getting his GED. I know he's been tutoring his cousins and kids in the neighborhood that need help. Juwan's future plans in life is to make better choices, stay positive and to stay out of trouble. I will make sure the people he associates his time with is doing positive things with themselves. Before this case, Mr. Anderson had already started making changes in his life, but this was just a step back from someone he thought he could trust to keep him out of trouble.


      Sincerely Yours,

      Nikia Johnson